UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| ADAM C. SCOTT | * | CIVIL ACTION 2:17-04815 |
| Plaintiff | * | |
| | * | SECTION "B"(1) |
| Versus | * | |
| | * | |
| UNION PACIFIC RAILROAD | * | JUDGE IVAN L.R. LEMELLE |
| COMPANY | * | MAG. KAREN WELLS ROBY |
| Defendant | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO JOINT MOTION *IN LIMINE*
TO EXCLUDE PLAINTIFF'S LIABILITY EXPERT, BRIAN HANSEN**

**MAY IT PLEASE THE COURT:**

Adam Scott ("Scott") filed this suit against his railroad employer, Union Pacific Railroad Company ("UP"), to recover damages under the Federal Employers' Liability Act, 45 U.S.C. §51, *et seq.* ("the FELA"), for injuries he sustained on February 9, 2015 when he fell into a sinkhole while performing his duties as a Brakeman at a grain plant owned by Archer Daniels Midland Company ("ADM") in Ama, Louisiana.  UP thereafter filed a Third Party Demand against ADM, seeking contractual and legal indemnity for any damages it was found to owe Scott.

In the course of the litigation, Scott  retained, as a liability expert, Brian Hansen ("Hansen"), who worked for Union Pacific for over twenty (20) years, including as a Manager of Track Maintenance responsible for track construction, maintenance and inspection, and ensuring compliance with track safety standards.  Defendant UP and Third Party Defendant ADM ("Movants") now jointly move *in limine* for an order excluding Hansen from testifying under

1

*Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 113 S. Ct. 2786 (1993).  For the following reasons, the Motion should be denied because Movants' complaints about Hansen's opinions do not go to his qualifications, but to the bases and sources of his opinions and are thus the proper subject of cross-examination.

The subject accident occurred in the pre-dawn hours of February 9, 2015.  Scott was assigned to perform a brake inspection on rail cars that were located on Track 4 at the northern end of the ADM grain plant.  The job required Scott to check the brakes on both sides of every car of the train consist, which entailed walking completely around the train along the walking pathway adjacent to the track where train crews, conductors, and brakemen would be expected to walk while performing their job requirements. As he walked east past the consist the first time, Scott saw a hole in the walking pathway that was about the size of a grapefruit.  The hole was approximately seven feet from the edge of Track 4. He shone his lantern on the hole to observe it, and then walked around it on the sloped incline on the ballast rocks between the hole and the track to continue his inspection.

After he completed this inspection and the brakes were released, Scott again had to circle around the train and walk along the same walking pathway to check the brake release. When he came to the grapefruit-sized hole, he knew to avoid it and again walked around it by walking on the steep incline between the hole and the track. Unbeknownst to Scott, however, the hole was actually part of a sinkhole that had developed under the sloped ballast incline; and as he walked on the incline, the ground collapsed beneath him, and Scott fell into the sinkhole. The sinkhole into which Scott fell was approximately three to four feet deep and three feet in diameter. Scott injured his legs and his back, *inter alia,* as a result of the fall.

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702. In *Daubert, supra,* the Supreme Court held that Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.,* 509 U.S. at 589, 113 S. Ct. at 2794-95.

A court's role as a gatekeeper, however, does not replace the traditional adversary system, and "[a] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." *Thomas v. W&T Offshore, Inc.*, 2018 WL 4223589, at *3 (E.D. La. Aug. 27, 2018); see also *Nimely v. City of New York*, 414 F.3d 381, 395 (2nd Cir. 2005) (noting "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions"). As the Supreme Court emphasized in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky, but admissible evidence." *Id.*, 509 U.S. at 596, 113 S. Ct. at 2798. The Fifth Circuit has instructed that "[t]he district court should, initially, approach its inquiry with the proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). As a general rule, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." *Id*.

At the outset, it is important to note that Movants do not complain of Hansen's qualifications to testify as a Railway Track Consultant expert concerning the construction, inspection, and maintenance of railroad track, and safety issues related to such activities. They do object that Hansen is not a geologist; but as discussed below, Hansen (1) does not hold himself out to be a geologist, (2) does not seek to be qualified as such, and (3) included no

opinions in the area of geology in his report. (See Report of Brian Hansen, attached as Exhibit "1.") The critical point is that Movants do not object to Hansen's qualifications in the area of track construction, inspection, and maintenance upon which his opinions are based.

Movants refer dismissively to Hansen as a "safety expert," but Eastern District courts have not hesitated to allow the testimony of safety experts qualified in the field of their expertise when their testimony would assist the finder of fact. See: *Thomas v. W&T Offshore, Inc.*, *supra*; *Lewis v. Chet Morrison Contractors, LLC*, 959 F. Supp. 2d 962 (E.D. La. 2013); *Montgomery v. Parker Towing Co., Inc.*, 2008 WL 559569 (E.D. La. Feb. 26, 2008); *Williams v. Union Pacific R. Co.*, 1992 WL 395285 (E.D. La. Dec. 14, 1992). It is note-worthy in this regard that Defendant UP—one of the movants—employed Hansen from June 1992 to June 2013, a period of twenty-one (21) years, and assigned him to numerous positions that required him to ensure UP compliance with track safety standards—including Track Welding Foreman, Manager of Track Maintenance, Track Supervisor, System Engineer Supervisor, and System Welding Foreman. (See the Curriculum Vitae of Brian Hansen, attached as Exhibit "2.") During that time, he conducted investigations to determine the root cause of numerous accidents in this role as a Track Manager and Supervisor at UP. The purpose of any such accident investigation was to determine not only the root cause of the accident, but also to develop a corrective action plan to prevent a reoccurrence. (Hansen Report, p. 2.) Hansen reviewed thirty-four documents and authoritative materials, including pleadings and written discovery; depositions of Scott and corporate representatives of UP and ADM; accident reports and witness statements; photographs; the UP-ADM lease; numerous UP rules and manuals on track inspection and maintenance; and Track Safety Standards promulgated by the FRA. *Id.*, pp. 1-2. Included in the discovery

4

answers Hansen reviewed were ADM's track inspection records for its Ama grain plant, which reflected that the reports contained the same track defects month after month, indicating that the defects observed and reported by the inspector to ADM were not being repaired. Based on the application of his extensive railroad experience and knowledge of the substantial evidentiary record, Hansen concluded that Track 4 was not adequately inspected or maintained, and that adequate inspection and maintenance of Track 4 would have disclosed the existence of the sinkhole before it developed into a dangerous walking hazard.

In his deposition, Hansen indicated he was an expert in the fields of railroad track maintenance, construction and inspection. (See portions of the transcript of the Deposition of Brain Hansen, attached as Exhibit "3," p. 10.) He explained that the scope of his expertise encompassed the track itself, the roadbed, the right-of-way, vegetation control and drainage along the right-of-way. *Id.* He was previously employed by UP from 1992 until 2013, and held the position of Manager of Track Maintenance in North Platte, Nebraska. (Hansen Depo., pp. 6-9) Hansen reviewed the monthly inspection reports prepared by Bobby Pontiff/Industrial Railroad Services for ADM, and observed that the reports would contain the same track defects month after month, indicating that the defects observed and reported by Pontiff to ADM were not being repaired. (Hansen Depo., pp. 158-59, 176-77.) He emphasized that this meant that necessary maintenance was not being performed, and that this fact was reflected by the monthly inspection reports showing the same defect for months in a row. *Id.* He explained that Union Pacific should have reviewed ADM's monthly inspection reports to be certain that proper maintenance was being done. (Hansen Depo., pp. 158-59.) He further testified that, if necessary maintenance had been performed on Track 4, there would not have been a hole in the toepath

5

where Scott was walking on February 9, 2015 because proper maintenance would have detected it before it could become a safety hazard. (Hansen Depo., p. 177.) Hansen identified additional evidence that proper maintenance was not being performed on Track 4 at the time of the accident: photographs taken of the accident scene demonstrated that the ballast shoulder on the track was not proper and that vegetation was present beside the track, both of which reflect inadequate maintenance. (Hansen Depo., pp. 152-54.) It is Hansen's opinion that the sinkhole was a part of the hole in the walking toepath, and it developed there because of a lack of proper maintenance. (Hansen Depo., pp. 155-56.)

Movants make three primary arguments in their Joint Motion *in limine* in an effort to show that Hansen's opinions are unreliable. More specifically, they assail (1) Hansen's reliance on Scott's testimony that he observed a grapefruit-sized hole in the walking path prior to his accident; (2) Hansen's "geological" opinions; and (3) Hansen's opinion that the track inspectors at ADM's facility were not inspecting the track for the presence of holes in the walking paths. The motion should be denied because none of these arguments go to the issue of reliability under Rule 702, but instead each goes to the bases and sources of his opinions which "affect the weight assigned to the opinion rather than its admissibility and should be left for the jury's consideration." *Lewis v. Chet Morrison Contractors, LLC*, 959 F. Supp. 2d 962, 966 (E.D. La. 2013), quoting *Viterbo, supra,* 826 F.2d at 422.

Movants first attack Hansen's reliance on Scott's allegedly "self-serving" and "uncorroborated" testimony regarding the presence of the grapefruit-sized hole in the Track 4 walking path on the morning of the accident. This argument is premised on the notion that Scott falsely manufactured the presence of a hole that was not actually present on the day of the

6

accident in order to overcome Movants' various assertions that neither had actual nor constructive notice of the hole and thus it was unforeseeable. Movants make this clear on page 2 of their Joint Memorandum where they write: "In *a desperate attempt make a sinkhole a foreseeable condition*, Scott testified that, minutes prior to the incident, he walked in the same location and notice a small 'grapefruit-size' hole." (R. Doc. 54-1, p. 2.)(emphasis added.) Movants' argument that Scott tactically created a grapefruit-size hole where none existed for litigation purposes is itself entirely self-serving and uncorroborated, and provides no basis to exclude Hansen because of his reliance on it.

As an initial matter, Scott's testimony regarding the grapefruit-size hole is necessarily "uncorroborated" because his accident occurred just past 4:00 a.m. in morning and was unwitnessed. However, he reported the existence of the hole to representatives of both UP and ADM immediately following the accident. More specifically, the handwritten notes of Elisa Tubbs, UP's claim agent, written on an UP Employee Injury Incident form on the day of the accident states: "[Brakeman] walking train, **stepped around small hole** and ground collapsed into larger sinkhole." (See Elisa Tubbs' notes, attached as Exhibit "4.") (emphasis added.) Similarly, the ADM Illness/Injury Consequence Report, also prepared on the day of the accident, states: "Union Pacific brakeman reported that as he was walking the train for a release test **he saw the 3' diameter hole and walked around the hole**[.] When he walked around the hole, the ground gave way and he fell into the 3' diameter x 3' deep hole." (See ADM Illness/Injury Consequence Report, attached as Exhibit "5.") (emphasis added.) These two nearly-contemporaneous statements reflecting that Scott saw the hole on the morning before his accident go a long, long way to undermine the credibility of Movants' claim that he invented the

7

hole for the sole purposes of a lawsuit filed over two years later.

Moreover, additional evidence that UP had actual knowledge of a hole and vegetation in the walking path of Track 4 has come to light subsequent to Hansen's report and deposition. More specifically, the UP Manager of Track Maintenance at the time of the accident, Johnny Taylor, has provided a Declaration, signed April 15, 2019, that establishes that he personally investigated and located the existence of a walking hazard in the form of a hole in the walking path of Track 4 at or near where Scott's accident occurred prior to February 9, 2015. (See Declaration of Johnny Taylor, attached as Exhibit "6," paras. 4-6.) While he is unsure of whether the hole was the one that Scott saw before his accident, this evidence corroborates the fact that UP was on notice of the presence of holes in the walking path of Track 4 prior to Scott's accident.

The court in *Lewis v. Chet Morrison Contractors, LLC, supra*, faced a similar argument as the one Movants advance here. More specifically, the defendant in *Lewis* argued that the plaintiff's expert should be excluded because he "based [his] opinion solely on plaintiff's self-serving statements." *Id*., 959 F. Supp. 2d at 966. The court denied the motion to exclude, concluding that such reliance does not provide a basis to exclude an expert's testimony because it necessarily goes to the bases of his opinion, and "questions relating to the bases and sources of an expert's opinion affect the weight assigned to the opinion rather than its admissibility and should be left for the jury's consideration." *Id*. at 966, quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987). The same is true of Hansen's reliance on Scott's testimony regarding the accident here. It is "the role of the adversarial system, not the court, to highlight weak evidence." *Primrose Operating Co. v. Nat'l Am. Ins. Co*., 382 F.3d 546, 563 (5th Cir. 2004).

8

Movants next argue that Hansen is not qualified to give expert testimony as to how and when the sinkhole and the grapefruit-sized hole developed because he is not a geologist. This argument misses the mark because Hansen is not seeking to be qualified as a geologist, and nothing in his CV or report indicates that he is seeking such an expert qualification. Indeed, nowhere in Hansen's report does he discuss how or when the grapefruit-sized hole or the sinkhole developed or manifested. The only reason why Hansen opined on such issues in his deposition is because he was asked questions about it by counsel for UP and ADM. Hansen's willingness to answer unreasonable questions posed by opposing counsel about geology does not provide a basis to exclude his testimony, especially since Hansen acknowledges his is not a geologist.

On the other hand, Hansen **does** have over twenty-five years of experience in the railroad industry in the fields of Track Construction, Inspection and Maintenance, and Railway Engineering, with over twenty of those years as a Union Pacific employee. While in its employ, Union Pacific saw fit to place Hansen in positions such as Manager of Track Maintenance and Track Welding Foreman, which made him responsible for the inspection and maintenance of UP track in order to ensure that it was in compliance with FRA and UP track safety standards. Scott's role in these positions included the inspection and maintenance of UP track in order to identify and repair hazards in the track, roadbed, and walking paths before they could develop into a dangerous condition.

Hansen's opinions in this case—i.e., that adequate inspection and maintenance of Track 4 would have disclosed the existence of the hole Scott encountered on the morning of February 9, 2015—are based on his twenty-plus years of experience in the railroad industry. His work in this

9

case was to determine, based on his experience of track inspection and maintenance, whether and to what extent UP's conduct in the inspection and maintenance of Track 4 contributed to the existence of the walking hazards that resulted in Scott's injury. His opinions are based on his knowledge of the walking hazards which were documented in this case, such as holes and vegetation in walking paths, and the role track maintenance has in preventing them. They have nothing to do with geology, and the fact that UP and ADM asked geological questions in his deposition does not undermine in the slightest Hansen's expertise in the fields of Track Construction, Inspection and Maintenance, and Railway Engineering.

In addressing a similar situation in *Montgomery v. Parker Towing Co., Inc*., 2008 WL 559569 (E.D. La. Feb. 26, 2008), Judge Africk refused to exclude the expert testimony of a safety expert, stating "[the witness] is not seeking to be qualified as a naval architect or a mechanical engineer, but rather as a **safety expert**, for which he has sufficient qualifications. *Id.* at *2. The strength of Hansen's credentials similarly goes to the weight of his testimony and not its admissibility. See: *Curry v. ENSCO Offshore Co.,* 54 Fed. App'x. 407 (5th Cir. 2002) (holding that a safety director was qualified to testify as an **expert** in marine **safety**, despite defendant's arguments that the expert was not qualified as a biomechanical engineer or any other relevant discipline).

Finally, Movants assert that "Hansen makes another unsubstantiated, baseless assumption that the track inspectors were not searching for holes or sinkholes, which is why the 'grapefruit-size' hole and sinkhole were not discovered." (Rec. Doc. 54-1, p.4.) This argument is completely unsubstantiated. Hansen reviewed not only the Rule 30(b)(6) Deposition of ADM, through its designee, Scott Walsh, and the Rule 30(b)(6) Deposition of UP, through its designee,

10

Dave Finley, but also the reports of the track inspections done by Pontif for ADM.  Hansen testified that he based his opinion of the track inspections on the evidence he reviewed. (Hansen Depo., p. 121.)  Like the other two lines of attack upon Hansen in the Joint Motion to Exclude, this one also goes to the bases and sources of Hansen's opinions—simply put, Movants do not think that Hansen's opinion is supported by the sources upon which he bases them.  But as with the other two lines of attack, this one is also subject to the rule that "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." *Viterbo,* 826 F.2d at 422.

While Movants' critiques of Hansen's opinions as set forth in their Motion to Exclude may be appropriate for cross-examination, they are insufficient under well-established legal standards to disqualify Hansen as an expert.  For the foregoing reasons, UP and ADM's Joint Motion *In Limine* to Exclude Brian Hansen should be denied.

        **Respectfully Submitted,**

        **ROME, ARATA, BAXLEY & STELLY, L.L.C.**

**BY:**     /s/ *William Chad Stelly*
        **W. CHAD STELLY #21140**
        **BLAKE G. ARATA, JR. #1697**
        **C. PERRIN ROME, III #17774**
        650 Poydras Street, Suite 2017
        New Orleans, Louisiana 70130
        Telephone: (504) 522-9980
        Facsimile: (504) 522-9971
        Email: **wcstelly@romearata.com**
               **barata@romearata.com**
        *Attorneys for Adam Scott*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above foregoing has been served upon all counsel of record via electronic transmission and/or by placing same in the United States Mail, postage prepaid, and properly addressed on this 16th day of April, 2019.

/s/ *William Chad Stelly*
**W. CHAD STELLY**